## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **THE ESTATE OF ISAIAH TRAMMELL** <br> By Administrator William M. Harrelson II, <br> c/o Friedman Gilbert + Gerhardstein <br> 50 Public Square, Ste 1900, <br> Cleveland, OH 44113, <br><br> **Plaintiff,** <br><br> vs. <br><br> **MONTGOMERY COUNTY,** <br> c/o Ward Barrentine <br> Chief, Civil Division <br> Montgomery County Prosecutor's Office <br> 301 W. Third Street <br> Dayton, OH 45402, <br><br> **JOSEPH SOLOMON,** <br> **BRIAN GODSEY,** <br> **MICHAEL BITTINGER,** <br> **CONNOR BLUM** <br> **DANIEL J. CHOI,** <br> **CHRISTOPHER L. JONES,** <br> **A. LITTLEJOHN,** <br> **ADELINA OSWEILER,** <br> c/o Ward Barrentine <br> Chief, Civil Division <br> Montgomery County Prosecutor's Office <br> 301 W. Third Street <br> Dayton, OH 45402 <br><br> **NAPHCARE, INC.,** <br> c/o Corporation Service Company <br> 1160 Dublin Road, Suite 400 <br> Columbus, OH 43215, <br><br> **BRITTANIE HOLZFASTER,** <br> **CASSIE KIRKPATRICK SMITH,** <br> **PATRICK REDMAN,** <br> c/o Corporation Service Company <br> 1160 Dublin Road, Suite 400 | Case No. <br><br> Judge <br><br><br> **COMPLAINT AND JURY DEMAND** |

Columbus, OH 43215,

**Defendants.**

1.      This is a civil rights action to redress for Defendants' failure to protect and refusal to provide objectively reasonable medical care to Isaiah Trammell, a 19 year-old man with autism who was booked into the Montgomery County Jail while experiencing extreme anxiety and distress, which manifested in stimming behaviors that eventually escalated to self-harm with suicidal intent and plan.

2.      When Isaiah died, Defendants knew that Isaiah was autistic and that he said he planned to kill himself by bashing his head into his cell door and walls—and that he had already tried to die in this manner just hours before. But Defendants provided no medical or psychiatric care to Isaiah when he disclosed his autism early in his detention or when he disclosed his suicide plan.

3.      Isaiah's initial stimming behaviors and later efforts to self-harm and die by suicide made it obvious that he had a serious medical need requiring psychiatric and medical care in a safe environment where he could not strike his head against hard surfaces.

4.      These serious medical needs were particularly acute for an actively suicidal neurodivergent person like Isaiah, whose autism rendered him susceptible to stimming in a way that would cause self-injury—namely, striking his head against hard surfaces.

5.      Yet Defendants intentionally chose to ignore Isaiah's serious medical and psychiatric needs and sought neither constitutionally appropriate medical care nor a safe environment for him. Instead, they openly treated him with contempt, goading and mocking him

until he foreseeably engaged in escalating acts of self-harm until he eventually lost consciousness and died from his head injuries..

6.     Isaiah's death was unnecessary, preventable, and all too foreseeable. Had any Defendant taken action to have Isaiah transferred to an appropriate medical or psychiatric facility so he could receive a higher level of care in a safe environment for an autistic and actively suicidal person, Isaiah would not have died.

7.     Unfortunately, Isaiah was not the first (or last) inmate to die because employees of Montgomery County and its contracted medical and mental healthcare provider, NaphCare, Inc. failed to provide constitutionally adequate care for those in custody. Montgomery County's and NaphCare's unconstitutional policies, practices, and customs in place at the time of this incident were the moving force propelling and sanctioning their employees' misconduct.

8.     Even before Isaiah's death, Defendant Montgomery County was on notice that people incarcerated at the Montgomery County Jail had been subject to the unconstitutional denial of medical services at the hands of its own employees and NaphCare employees. Despite notice of these constitutional deprivations, Defendants Montgomery County and NaphCare failed to rectify these ongoing practices in time for Isaiah to receive necessary and life-saving medical care.

9.     Plaintiff brings this action to seek change for other individuals who present to the Montgomery County Jail with serious medical needs in the future, especially individuals on the autism spectrum who may react to incarceration in different ways than neurotypical people. Plaintiff demands reform and justice on behalf of Isaiah Trammell and all others who have suffered and died because the Montgomery County Jail corrections and medical staff intentionally disregarded their serious medical needs.

**JURISDICTION AND VENUE**

10.     The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. §1983 *et seq*.; the Judicial Code, §§1331 and 1343(a); and the Constitution of the United States. Supplemental jurisdiction over related state law claims is invoked pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this District under 28 U.S.C. §1391(b). The Parties reside, or, at the time of the events took place, resided in this judicial district, and the events giving rise to Plaintiff's claim also occurred in this judicial district.

**PARTIES**

12.     Plaintiff William M. Harrelson II is the duly appointed Administrator for the Estate of Isaiah Trammell. Harrelson was appointed as the Administrator of the Estate of Isaiah Trammell on February 20, 2025 by the Warren County Probate Court in Case No. 2025-1098.

13.     Defendant Montgomery County is a municipal corporation, duly incorporated under the laws of the State of Ohio and located in this judicial district, is the employer and principal of Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler, and is responsible, through its Sheriff, for the training, supervision, policies, practices, and customs of the Montgomery County Jail.

14.     Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler were, at all times relevant to the allegations of this Complaint, duly appointed correctional officers working at the Montgomery County Jail and acting within the scope of their employment and under color of state law. They are each sued in their individual capacity.

15.     Defendant NaphCare, Inc. is a private for-profit corporation duly incorporated under the laws of the State of Alabama and doing business in this judicial district. At all times relevant to this Complaint, Defendant NaphCare contracted with Defendant Montgomery County

4

to provide medical care to inmates at the Montgomery County Jail and was the employer and principal of Defendants Holzfaster, Smith, and Redman. Defendant NaphCare is responsible for the training, supervision, policies, practices, and customs of medical and mental health services provided at the Montgomery County Jail during the relevant time periods.

16. Defendant Brittanie Holzfaster is an individual and "person" under 42 U.S.C. § 1983 who, at all times relevant to this Complaint, was employed by Defendant NaphCare, Inc. as the Mental Health Director at the Montgomery County Jail and acting within the scope of her employment and under color of law. She is sued in her individual capacity.

17. Defendant Cassie Kirkpatrick Smith is an individual and "person" under 42 U.S.C. § 1983 who, at all times relevant to this Complaint, was employed by Defendant NaphCare, Inc. as a Mental Health Professional at the Montgomery County Jail and acting within the scope of her employment and under color of law. She is sued in her individual capacity.

18. Defendant Patrick Redman is an individual and "person" under 42 U.S.C. § 1983 who, at all times relevant to this Complaint, was employed by Defendant NaphCare, Inc. as a Medic at the Montgomery County Jail and acting within the scope of his employment and under color of law. He is sued in his individual capacity.

**FACTS**

**Isaiah Trammell**

19. Isaiah Trammell was a 19 year-old sports fanatic who loved outdoor activities like hiking and four-wheeling and who enjoyed close, loving relationships with his parents and siblings.

20. Isaiah, like an estimated 15 to 20% of the population, was neurodiverse. He had autism, attention deficit hyperactivity disorder, and Tourette's syndrome. Despite the challenges

5

Isaiah faced as a neurodivergent individual, he was determined to live an independent, fulfilling life characterized by compassion.

21.     In his daily life, including at work, Isaiah frequently disclosed his autism to people he encountered to help them better understand him and to normalize autism.

22.     People on the autism spectrum frequently have specific triggers that can cause them to become overstimulated and overwhelmed, disrupting self-regulation. Isaiah's triggers included being touched by people he did not know, being restrained, being confined in a small space, being nude, and loud noises. Each of these are common triggers for individuals with autism.

23.     People with autism often engage in stimming, or self-stimulating behaviors, to help self-regulate and self-soothe, particularly when confronted with stressful situations that cause sensory overload and overstimulation. Stimming is a coping mechanism for autistic individuals, who experience greater sensitivity to external stimuli.

24.     Commonly known stimming behaviors include rocking one's body back and forth, flailing one's arms, banging one's head against hard surfaces, pacing, shrieking, making repetitive noises, or other repeated movements. People with autism have little to no control over their stimming behaviors.

25.     Although Isaiah sometimes struggled to self-regulate, he nonetheless pursued his goals. After graduating high school, he began working and moved into his own apartment. His family was proud of his independence and hoped to see him thrive as a young adult.

### Isaiah's Arrest

26.     On March 12, 2023, at approximately 11:29 p.m., Lebanon, Ohio police officers were dispatched to Isaiah's apartment based on a neighbor's report of a potential domestic violence incident in progress.

6

27.     Isaiah's neighbor was mistaken: Isaiah had been arguing with his uncle on a telephone call. Because of his autism, Isaiah sometimes had difficulty regulating strong emotions and became loud when he was angry, upset, or frustrated. But he had not committed any act of domestic violence: Isaiah was alone in his apartment, as the Lebanon officers confirmed.

28.     Although Isaiah had committed no crime, the Lebanon officers ran Isaiah's social security number and found an old domestic violence warrant issued by the Montgomery County Sheriff's Office. Neither Isaiah nor his family had known this warrant existed. It was mistakenly issued: Isaiah's mother later learned it arose from a wellness check conducted when Isaiah was having difficulty self-regulating. Autistic individuals like Isaiah are often subject to wellness checks for similar episodes.

29.     The Lebanon officers arranged to transfer custody of Isaiah to a Montgomery County deputy sheriff.

30.     The responding Lebanon officers noted in the police report that Isaiah expressed "how he struggles with mental health problems and has suicidal ideologies," that Isaiah "wanted to die."

31.     Lebanon Division of Police Officer Austin Snowden told Montgomery County Deputy J. Fore about Isaiah's statements about his mental health issues and suicidal condition.

**Isaiah's Ten-Hour Pretrial Detention in the Montgomery County Jail**

32.     Isaiah disclosed his autism to corrections officers when he arrived at the Montgomery County Jail.

33.     Upon arrival to the Jail, while in the facility's outer receiving room with the arresting officer, Isaiah began banging his head against the wall—a common method of stimming under stress for autistic people.

34.     NaphCare Mental Health Professional Kathleen Fraser (MHP Fraser) met with Isaiah in the Jail's receiving area at approximately 1:13 a.m. on March 13, 2023.

35.     Isaiah explained to MHP Fraser that banging his head was "the only way" to "get rid of the crazy in [his] head" and told her he did not want to live. Isaiah's stimming under the incredibly stressful conditions of his unexpected detention had combined with suicidal ideation and escalated to self-harm.

36.     Based on Isaiah's clear expression of suicidal ideation, MHP Fraser recommended that Isaiah should be placed on suicide precautions "with mat and blanket, high-risk level with no property or privileges."

37.     After being placed in a suicide watch cell, Isaiah began screaming and pacing around his cell and banging on his cell door's window. Being trapped in small spaces was one of Isaiah's triggers for losing his ability to self-regulate. Isaiah expressed frustration at being exhausted and unable to sleep on the concrete floor. Isaiah periodically hit his head on the cell window between 1:13 and 4:15 a.m., as at least one officer witnessed.

38.     Isaiah's behavior in the receiving area and in his suicide watch cell—pacing, screaming, and banging his head—represented classic stimming by an autistic person placed in a stressful situation and experiencing suicidal ideation.

39.     At approximately 3:15 a.m., Defendant Sergeant Joseph Solomon went to Isaiah's cell because Isaiah had been banging his head on the cell door, causing injury to himself. Defendant Solomon, ignoring Isaiah's obvious psychological distress and head injuries and took no actions to help him. Instead, he just "ordered" Isaiah to stop banging his head.

40.     Despite Defendant Solomon's foreseeably ineffective tactic, Isaiah tried to accurately communicate his needs: he told Solomon that he was uncomfortable and could not

8

sleep. Defendant Solomon told him that because he had been placed on suicide precautions, he would not be provided bedding (even though MHP Fraser recommended he be given a mat and blanket). Isaiah said that no one would speak with him and no one cared about him. Defendant Solomon told him he would ask MHP Fraser to speak with him but did not request that a medical professional evaluate Isaiah's head injuries.

41.     MHP Fraser spoke with Isaiah again at approximately 3:18 a.m., and Isaiah again made his suicidal ideation clear: "I already tried to commit suicide tonight. Nobody cares about me. I want to die." Isaiah had a plan to attempt suicide again, and he told MHP Fraser: "I want to bang my head hard until I pass out and my brain stops working and I die."

42.     In the same conversation, Isaiah shared his distress with MHP Fraser regarding his inability to sleep on the hard concrete floor of his cell, saying: "My head hurts. All I want is a blanket and mat to go to sleep. I can't sleep there because my head hurts."

43.     It is common knowledge that sleep deprivation aggravates emotional and psychiatric distress, but none of the Jail staff gave Isaiah a suicide-proof mat or blanket so he could sleep.

44.     MHP Fraser spoke to the Jail's first floor medic, NaphCare employee Defendant Medic Patrick Redman, and requested that Isaiah receive medical evaluation for his report of head pain caused by banging his head onto hard surfaces.

45.     Defendant Redman did not evaluate Isaiah, and he did not ask any other NaphCare medical professional to do so, despite this known traumatic head injury. This constituted a denial of medical care for a serious medical need.

46.     Defendant correctional officer Connor Blum saw Isaiah screaming, pacing his cell, and banging on the window of his cell door throughout the early hours of the morning. At

approximately 4:15 a.m., Defendant Blum witnessed Isaiah "forcefully bang[ing] his head multiple times causing immediate swelling." Defendant Blum did not request medical assistance for Isaiah's head injuries.

47.     Instead of using effective measures to de-escalate Isaiah or requesting immediate assistance for his head injuries, Defendant Solomon ordered corrections officers to place Isaiah in a restraint chair.

48.     After Isaiah was placed in the emergency restraint chair, MHP Fraser spoke to Isaiah at approximately 4:20 a.m. She reported that Isaiah continued to speak "at length" about his depressed mood and again endorsed suicidal ideation.

49.     MHP Fraser saw Isaiah continue to bang his head against the hard back of the emergency restraint chair at approximately 4:20 a.m., demonstrating that the County corrections officers and Defendant Redman failed to protect Isaiah from continuing this method of self-harm. Protective measures were available, including placing cushioning behind his head.

50.     Defendant Redman was present to check Isaiah's restraints in the chair. He looked briefly at Isaiah's forehead but conducted no neurological examination and provided no medical treatment for Isaiah's obvious head injury. Defendant Redman did not request that any nurse, physician, or other NaphCare medical provider evaluate Isaiah's head injury. This constituted a denial of medical care for a serious medical need.

51.     Upon information and belief, Defendant Redman failed to follow NaphCare's head injury protocol.

52.     During his time in the restraint chair, Isaiah begged for a bed so he could sleep, but Defendant Solomon again told him that he could not have a bed while on suicide watch and did nothing to help Isaiah, who obviously needed sleep.

53.     Isaiah was eventually released from the emergency restraint chair and placed back in his cell, still on suicide watch, at 6:15 a.m.

54.     After Isaiah was returned to his cell, Defendant Sergeant Brian Godsey observed Isaiah repeatedly pacing and hitting the cell door with his fist.

55.     Defendant Godsey spoke to Isaiah around 9:00 a.m. Isaiah requested a mat and blanket and a phone call, and Godsey denied these requests, purportedly based on the Jail's policy for suicide watch precautions. But MHP Fraser had placed Isaiah on suicide precautions "with mat and blanket."

56.     As is common in individuals with autism, Isaiah usually sought comfort from trusted family members (especially his mother) in times of stress. Had Isaiah been able to call his mother, she likely would have been able to help him calm down.

57.     Between 9:00 and 9:30 a.m., Defendant Godsey contacted Defendant Mental Health Professional Cassie Smith regarding Isaiah's behavior, and Smith advised Godsey that she had spoken to Isaiah "not too long ago."

58.     Defendant Smith had, in fact, last seen Isaiah more than an hour before at 7:56 a.m. during daily rounds. Defendant Smith's report of this visit stated that Isaiah reported "active suicidal ideation" and that he was agitated, angry, tense, hostile, and loud.

59.     Despite observing Isaiah's manifest distress at 7:56 a.m. and receiving Defendant Godsey's request between 9:00 and 9:30 a.m., Defendant Smith did not return to see Isaiah.

60.     When Defendant Smith refused to help Isaiah, Defendant Godsey did not seek help from any other mental health or medical professional when Defendant Smith refused to see Isaiah. Nothing prevented Defendant Godsey, a correctional supervisor, from calling the Jail's medical

staff. By recognizing Isaiah's serious medical need and refusing to secure medical assistance, Defendant Godsey was deliberately indifferent.

61.     At approximately 9:30 a.m., Defendant Godsey escorted Isaiah to video court, where Isaiah learned that he would not be released from the jail as he had hoped.

62.     Defendant Godsey observed that Isaiah was upset after attending video court and saw Isaiah jumping around and screaming in his cell. Based on Isaiah's deteriorating behavior, Defendant Godsey again requested that NaphCare mental health professionals speak to Isaiah to help him de-escalate.

63.     Before the mental health professionals arrived, Defendant Jones spoke with Isaiah shortly before 10:00 a.m. Instead of engaging Isaiah in a manner appropriate to his autism and psychiatric distress, Defendant Jones yelled at him angrily to sit down.

64.     Even worse, Defendant Jones invoked Isaiah's known terror of the restraint chair to threaten him: "You remember how the restraint chair felt? Remember what Sergeant said? You're gonna go in there for 10 hours next time you go in there. You wanna do that? Then have a seat and chill out. Sit down!" Defendant Jones's threats were in violation of Ohio law, which forbid using a restraint chair as punishment and prohibit restraining an individual for 10 hours. Ohio Admin. Code § 5120-9-05.

65.     Defendant Jones's actions escalated Isaiah's psychiatric crisis instead of helping Isaiah or seeking competent medical help for him. By observing Isaiah's serious medical need and refusing to seek medical help for him, Defendant Jones was deliberately indifferent.

66.     Defendant Godsey, Defendant Jones's supervisor, allowed and acquiesced in Defendant Jones's misconduct.

67.     Defendant Smith and Defendant Holzfaster went to Isaiah's cell door at 10:01 a.m. During their brief encounter, Isaiah told them that he planned to kill himself by banging his head onto the cell door and walls.

68.     Defendant Jones stood outside Isaiah's cell and listened to Isaiah's conversation with Defendants Smith and Holzfaster.

69.     Defendant Holzfaster responded to Isaiah's distress with annoyance instead of empathy, even though she should have understood that individuals with autism tend to experience incarceration with elevated anxiety. Holzfaster told him to calm down and mocked his manner of speaking, saying "you're an adult, talk like one." She repeated the corrections' officers' threat of putting him back in the emergency restraint chair.

70.     As Isaiah's desperation mounted, his cries for help became louder, asking why he was being placed in these specific conditions for suicide watch. Defendant Holzfaster did not explain *why* suicide watch necessitated placing Isaiah in such difficult conditions. She instead reiterated that he needed to be on suicide watch: "You just told me that you want to hurt yourself and gave me a whole plan" and "you just told me how you wanted to hurt yourself."

71.     Immediately after acknowledging Isaiah's current suicidal ideation and plan, as Isaiah screamed, Defendant Holzfaster dismissively concluded the interaction by saying "Okay, I'm done," and walking away from Isaiah's cell door with Defendant Smith. She had spoken to Isaiah for less than 3 minutes and left him in a state of elevated distress.

72.     Defendant Holzfaster and Defendant Smith walked from Isaiah's cell to the officers' desk, where five County Jail officers were present: Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler.

73.     As she approached, Defendant Holzfaster asked these five officers: "Can we put him down?" She then informed Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler that Isaiah had continued suicidal ideation and that he planned to hit his head on the wall again.

74.     Defendant Holzfaster and Defendant Smith left the area, showing these Defendant officers that they would take no further action to deescalate or help Isaiah. This constituted a denial of care for Isaiah's serious medical and psychiatric needs.

75.     Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler remained present near the desk, within sight and hearing distance from Isaiah's cell, for the next 13 minutes. During this time, they heard Isaiah screaming in terror and begging for help. They saw him pacing and flailing about his cell, his facial expression desperate and tormented through his door's window.

76.     Despite their knowledge that Isaiah planned to kill himself using the same method of self-harm in which he had previously engaged many times, and despite witnessing Isaiah's rising panic and agitation for 13 minutes, Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler did nothing to help him—even though help was available.

77.     Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler deliberately chose not to take any of the following actions to obtain constitutionally reasonable medical care for Isaiah's serious medical needs, all of which were available to them:

a.      They did nothing to speak to Isaiah to help him de-escalate in a manner appropriate for an autistic and suicidal person;

b.      They did not call the Jail's first floor medic, Chad Rowland, who was not only on the premises but on the same floor;

c.      They did not call the Jail's on-premises nursing staff;

d.      They did not call any Jail physician, who was either on the premises or on-call 24 hours a day;

14

e.      They did not call any Jail psychiatrist, who was either on the premises or on-call 24 hours a day;

f.      They did not take steps to have Isaiah transferred to an emergency room at a hospital;

g.      They did not take steps to have Isaiah transferred to a psychiatric hospital.

78.     These actions constituted a denial of care for Isaiah's serious medical and psychiatric needs.

79.     Further, Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler did not make any effort to protect Isaiah from self-harm and suicide by other means. None of these officers attempted to talk to Isaiah to calm him down and de-escalate him. None of them tried to make his environment safer for him.

80.     Instead of helping Isaiah, as they were duty-bound to do, the Defendant officers taunted and mocked him for his distress:

a.      When Defendant Holzfaster asked if they could "put [Isaiah] down," the Defendant officers laughed and joked about Isaiah's crisis state;

b.      At 10:06 a.m., one officer threatened that if Isaiah did not "hush," he would get the chair again;

c.      At 10:08 a.m., one officer went to Isaiah's door and said "I'd better not have to come into that cell. If I come in there, it's gonna be nothing but bad news." The officer also told Isaiah he was "acting like an ass."

81.     At approximately 10:12 a.m., Isaiah began screaming that he could not be here anymore and was going to die in here. Defendants Bittinger, Choi, and Jones heard him but did nothing.

82.     Upon information and belief, Defendant Godsey was nearby and heard Isaiah's continued distress and knew these five officers under his supervision were doing nothing. Defendant Godsey had the ability and opportunity to order them to help Isaiah or to help Isaiah

himself. He failed to do either, demonstrating his deliberate indifference to the manifestly increasing distress of an individual on suicide precautions.

83. As of 10:04 a.m., Defendants Bittinger, Choi, Jones, Littlejohn, Osweiler, Holzfaster, and Smith all knew that Isaiah had ongoing suicidal ideation with both intent and plan. And 13 minutes after Defendants Holzfaster and Smith walked away from Isaiah, dismissing his cries for help, and after 13 minutes of Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler ignoring his serious medical needs, Isaiah acted on his stated intent.

84. At 10:17 a.m., Isaiah ran from the back of his cell toward his door and struck his head against the door with such force that officers across the room reacted with audible gasps: "Ooooh, he just fucking nailed his head," one commented. Isaiah then struck his head again multiple times and fell to the hard concrete floor.

85. Defendant Godsey returned to the area and ordered that Isaiah be placed in the restraint chair, despite knowing that Isaiah was terrified of the chair. Isaiah, seeing the chair and gloved officers approaching, began shrieking no and begging them: "Please, let's talk about this!"

86. When the officers approached and entered his cell, Isaiah began screaming and violently hitting his head against the concrete cell wall. He was terrified of these officers touching him and restraining him again. Being touched and surrounded by strangers, being trapped, and being restrained were triggers for Isaiah, as they are for many autistic people. Isaiah screamed that he could not breathe amidst the chaos. As he continued shrieking and banging his head, one officer asked if a helmet was available for Isaiah, but no one answered or attempted to locate a helmet.

87. As the officers used force to tie Isaiah down in the restraint chair, Isaiah screamed and begged them to please stop and to listen to him. Officers repeatedly threatened to use force if Isaiah did not submit to the restraints.

88.     The officers put Isaiah in the small restraint chair room at 10:22 a.m.

89.     While Isaiah was in the restraint chair room, he pleaded with Jail staff and clearly articulated his feelings and needs to the officers, telling him that he was shaking and repeatedly begging for medications.

90.     Defendant Godsey saw that Isaiah's forehead injury was now reinjured with more severe swelling and took photographs of it. Defendant Godsey's recognition of this serious forehead injury should have prompted him to immediately call 911 to seek an ambulance for Isaiah's medical emergency. He did not.

91.     Medic Chad Rowland entered the restraint chair room at 10:22 a.m., where he observed Isaiah's visible closed head injury and remarked that Isaiah had not had that injury when he appeared for a receiving screening at around 8:15 that morning. Isaiah reported a three-second loss of consciousness to Medic Rowland.

92.     Isaiah begged for a higher level of medical care. At 10:22 a.m., he asked Medic Rowland to send him to a medical facility: "Can you please help me get out of here and into a better spot?"

93.     Based on his brief evaluation, Medic Rowland requested that Jail nurse Darrell Rader, R.N., assess Isaiah.

94.     At 10:23 a.m., Isaiah asked again for medications to ease his suffering: "Please, I want meds. Can I have meds? If I have meds, if I have meds, it'll stop. Please."

95.     As the officers gathered around him, one removed the blanket from his lap, exposing his nude body. Isaiah, like many autistic people, became extremely distressed by being exposed. The officers' casual cruelty caused Isaiah to begin screaming and banging the back of his head against the restraint chair at 10:24 a.m.

96.     Nurse Rader came to the restraint room and asked Medic Rowland and Isaiah questions at approximately 10:25 a.m. Nurse Rader determined that Isaiah required a level of care that the Jail medical staff could not provide, including a CT scan for his obvious head injury. Nurse Rader initiated the process for Isaiah to be sent to the hospital by ambulance.

97.     By 10:26 a.m., Isaiah's breathing had become heavily labored.

98.     Isaiah began to lose consciousness by 10:27 a.m.

99.     Despite these obvious signs of serious brain injury, one of the officers gathered around Isaiah referred to him as playing games—as if he were pretending to be unresponsive after a serious head injury.

100.     Isaiah was unresponsive by 10:28 a.m. and did not respond to Medic Rowland's requests for Isaiah to look at him and talk to him. Isaiah's breathing became more and more labored.

101.     Again, the officers did not acknowledge Isaiah's serious injury, with one officer describing the then-unconscious Isaiah as "highly combative" at 10:28 a.m.

102.     Emergency medical services from the Dayton Fire Department arrived to the jail at approximately 10:40 a.m. and found Isaiah unconscious with a large visible bruise on the right side of his forehead.

103.     When Dayton Fire Department emergency medical services arrived, the paramedic who assessed Isaiah noted that he was unconscious with pupils dilated to 8 mm and a Glasgow Coma Score of 4.

104.     The paramedic also recorded that Isaiah was engaged in decorticate posturing, a telltale sign of abnormal brain function and brain injury.

**Isaiah Succumbs to His Preventable Fatal Injuries.**

105.    By the time Isaiah arrived at the hospital as a Category 1 Trauma Alert, his Glasgow Coma Score was 3.

106.    Although Isaiah was intubated shortly after arrival at the hospital, a neurosurgical examination and imaging revealed that Isaiah's traumatic brain injuries were fatal and that surgical intervention would be futile.

107.    After three days in a coma, Isaiah passed away the morning of March 16, 2023.

108.    Isaiah's official cause of death was complications of blunt force head trauma. The coroner's postmortem examination revealed significant brain injuries, including a large acute subdural hematoma in the left cerebral convexity and base of brain, diffuse cerebral edema, and early Duret hemorrhages in the midbrain and upper pons. These brain injuries were associated with florid pulmonary edema.

### Constitutionally Inadequate Policies, Practices, Customs, Training, and Supervision by Montgomery County and NaphCare, Inc.

109.    At all times relevant to the events described above, Defendant Montgomery County contracted with Defendant NaphCare, Inc. to provide medical services to the people in the County's custody at the Montgomery County Jail.

110.    Isaiah was never seen or treated by a psychiatrist or other doctor while at the Montgomery County Jail, despite experiencing ongoing suicidal ideation with intent and plan, and despite sustaining head injuries.

111.    Upon information and belief, Defendant NaphCare had a policy and custom of using its mental health professionals to gatekeep medical and psychiatric care at the Montgomery County Jail, even when it was clear that the services of these counselors or social workers were insufficient to address the inmate's medical and psychiatric needs.

112.    The actions of Defendants Holzfaster and Smith, mental health professionals employed by NaphCare, illustrated this policy and custom. Defendants Holzfaster and Smith acted without appropriate supervision and guidance from medical providers, psychiatrists, or physicians when they evaluated Isaiah and learned he had suicidal ideation, intent, and plan—all of which are serious medical and psychiatric needs.

113.    As Mental Health Director, Defendant Holzfaster had final policymaking authority for NaphCare's mental health operation in the Montgomery County Jail.

114.    Defendant Holzfaster acted on behalf of Defendant NaphCare as well as in her individual capacity when she refused to counsel or seek medical and/or psychiatric care for Isaiah.

115.    Upon information and belief, Defendant NaphCare failed to properly train its mental health professionals on how to assist autistic or otherwise neurodivergent inmates, including those who were stimming and/or suicidal. Defendant NaphCare's failure to train rises to the level of deliberate indifference because it was foreseeable that its mental health professionals would encounter autistic, neurodivergent, and suicidal inmates, and it was obvious that the lack of this training would have disastrous consequences for these inmates.

116.    Defendant Smith's failure to seek medical and/or psychiatric care for Isaiah in the face of his substantial likelihood of suicide and her willingness to follow Defendant Holzfaster's direction demonstrates Defendant NaphCare's failure to train its mental health employees on how to recognize and address serious medical needs. If properly trained, Smith would have spoken up to Holzfaster or requested medical assistance. Instead, she stood by silently and did nothing to help Isaiah.

117.    Defendant Montgomery County had a legal duty to monitor Defendant NaphCare's performance under the parties' contract to ensure that people in the Montgomery County Jail

received constitutionally adequate medical care. Defendant Montgomery County failed to properly monitor NaphCare and correct deficiencies in the provision of care.

118. Defendants NaphCare, Inc. and Montgomery County were deliberately indifferent to the serious medical needs of people experiencing a psychiatric crisis by directing and permitting non-medical mental health providers to provide services to inmates who needed psychiatric care.

119. Defendants NaphCare, Inc. and Montgomery County acted negligently, recklessly, wantonly, willfully, knowingly, intentionally, and with deliberate indifference to the serious medical needs of Isaiah Trammell.

120. Upon information and belief, before Isaiah's injuries and death, Defendants NaphCare, Inc. and Montgomery County knew that people in the Jail were suffering from serious medical needs, but these Defendants were deliberately indifferent to their suffering.

121. Between 2020 and 2023, 18 people died in the Montgomery County Jail or at a hospital after transfer from the Jail.

122. The people who died at the Montgomery County Jail or after transfer from the Jail to a medical facility (like Isaiah) between 2016 and 2023 included Steven Blackshear, Aaron Dixon, Amanda Campbell, Amber Goonan, Gerald Ford, Nathan Griffith, William Devoe, Brian Booth, Tracey Myers, Sasha Garvin, and Christina Homa.

123. Tracey Myers died by suicide in the Jail in 2016.

124. Brian Booth died by suicide in 2022 after being transferred from the Jail to a hospital.

125. Upon information and belief, additional individuals died by suicide in the Montgomery County Jail or upon transfer to a hospital from the Jail.

126. Isaiah's death was the fourth of seven deaths caused by events occurring at the Montgomery County Jail in 2023 alone.

127. The prior deaths Jail demonstrate that Defendants Montgomery County and NaphCare, Inc. had customs of failing to monitor inmates for known medical problems, before Isaiah's wrongful death.

**Aaron Dixon**

128. Aaron Dixon, who died on January 13, 2023, suffered a serious head injury in his Montgomery County Jail cell less than 8 hours before he was found unresponsive.

129. Both Montgomery County and NaphCare staff knew about Mr. Dixon's head injury. After Mr. Dixon had activated his emergency button, officers saw that he had an obvious two-inch laceration on his forehead and that there was a "pool of blood" on his cell floor. Mr. Dixon's speech was slurred, and he had seizures. He received medical attention from NaphCare staff before he was transported to the hospital about 30 minutes later.

130. Mr. Dixon was returned to the Jail from the hospital just four hours after sustaining the head injury.

131. Despite knowing Mr. Dixon had suffered a serious head injury only a few hours earlier, neither Jail corrections staff nor NaphCare medical staff monitored Mr. Dixon for symptoms of head injury or other complications.

132. Mr. Dixon was found unresponsive approximately four-and-a-half hours after returning to the Jail from the hospital. Upon information and belief, the head injury and failure of the County and NaphCare to properly monitor Mr. Dixon contributed to his cause of death.

**Steven Blackshear**

133.    Steven Blackshear was found unresponsive in his Montgomery County Jail cell on January 29, 2023.

134.    Both Montgomery County and NaphCare had actual knowledge that Mr. Blackshear was suffering opiate and benzodiazepine withdrawal. Seven inmates told the Montgomery County detective investigating Mr. Blackshear's death that Mr. Blackshear had been showing symptoms and complaining of opiate withdrawal.

135.    One inmate reported that Mr. Blackshear had been saying he needed to go to the hospital and spoke to a nurse during medication pass. Another inmate reported that an officer had requested medical attention for Mr. Blackshear but that no medical staff came onto the pod to see Mr. Blackshear. This indicates that both NaphCare medical staff and County corrections staff were deliberately indifferent to Mr. Blackshear's serious medical needs by failing to provide care or ensure that medical staff provided care to Mr. Blackshear.

136.    The County's inspection of Mr. Blackshear's cell after his death showed fecal matter on the wall and floor, vomit on the lower bunk, and fecal matter on Mr. Blackshear's discarded clothing. Mr. Blackshear's serious medical need would have been obvious to any corrections staff looking into his cell during rounds or to any passing medical staff. Upon information and belief, Mr. Blackshear's drug use and/or withdrawal and the failure of the County and NaphCare to properly monitor Mr. Blackshear contributed to his cause of death.

**Amber Goonan**

137.    Amber Goonan was found responsive in her Montgomery County Jail cell on February 20, 2023.

138.    Ms. Goonan was arrested on February 19 at 1:00 p.m., when she was immediately treated with Narcan and taken to Grandview Hospital for suspected drug overdose. She was treated

with medication for an overdose at Grandview Hospital before she was released and taken to the Montgomery County Jail at 2:54 p.m.—less than two hours after her arrest.

139.    At 4:01 p.m. on February 19, NaphCare staff completed Ms. Goonan's medical intake screening, when she disclosed her medical treatment from earlier that day as well as other serious medical issues and mental health conditions. The NaphCare medic nonetheless cleared her for housing in general population in a withdrawal dorm, with detoxification monitoring only twice per day.

140.    At 9:48 p.m. on February 19, she was seen by a NaphCare nurse, who recommended reassessment in 8 hours. She was found unresponsive less than 8 hours later, at 4:45 a.m.

141.    Upon information and belief, neither Montgomery County corrections staff nor NaphCare staff monitored Ms. Goonan between 9:48 p.m. and 4:45 a.m., despite knowledge of her serious medical needs and hospital treatment for overdose earlier that day.

142.    Upon information and belief, Ms. Goonan's drug use and/or withdrawal and the failure of the County and NaphCare to properly monitor Ms. Goonan contributed to her cause of death.


143.    These deaths each placed Defendants Montgomery County and NaphCare, Inc. on notice of deficiencies in the medical care and correctional monitoring provided to inmates in the Jail. Instead of remedying these deficiencies, Defendants Montgomery County and NaphCare, Inc. adopted a custom of tolerance of the constitutional violations that caused many of these deaths, including deliberate indifference to inmates' serious medical needs by mental health, medical, and corrections staff.

144.    This custom of tolerance continued after Isaiah's death. Amanda Campbell was found unresponsive on April 4, 2023, less than a week after Isaiah's death. Immediately after her arrest, before being booked into the Jail, she was taken to the hospital for chest pains. At her Jail medical screening with NaphCare staff, she disclosed her hospital treatment, history of heart problems, and current use of methamphetamines, opioids, and alcohol. Less than two days later, after only three check-ins from NaphCare staff, she was found "blue in the face." Upon information and belief, neither Montgomery County nor NaphCare staff adequately monitored her despite her known medical conditions, and this lack of monitoring contributed to her cause of death.

145.    Upon information and belief, other deaths have occurred due to Montgomery County's and NaphCare's customs of tolerating deliberate indifference to serious medical needs by, inter alia, failing to properly monitor inmates.

146.    Additionally, by repeatedly determining that Montgomery County Jail correctional officers did nothing wrong when concluding investigations into these prior deaths, the Montgomery County Sheriff ratified the unconstitutional conduct of County employees. This ratification enabled and emboldened County correctional officers to continue failing to seek medical care for Jail inmates, thus causing the deliberately indifferent misconduct of Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler described in this Complaint.

147.    Further, Montgomery County failed to provide constitutionally adequate training to its correctional officers. Upon information and belief, based on public  records, Montgomery County failed to provide *any* training to Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler on suicide prevention or interacting with autistic people before their interactions with Isaiah.

## Harm to Isaiah Trammell, His Estate, and His Family

148.   As a direct and proximate cause of Defendants' actions, Isaiah suffered excruciating mental, emotional, and physical pain before his death.

149.   Isaiah was a beloved son and brother who was close to his parents and siblings. Isaiah's family was proud of Isaiah's determination and strength of character in the face of challenges posed by his autism.

150.   Every member of Isaiah's family has suffered an irreplaceable loss of joy and companionship, as well as their own mental anguish, loss of services, loss of society, loss of companionship, loss of care and assistance, and loss of any chance of inheritance from him.

151.   As a further direct and proximate result of Defendants' misconduct and the wrongful death of Isaiah, the Estate has incurred pecuniary losses, including funeral and burial expenses.

152.   Defendants acted negligently, recklessly, wantonly, willfully, knowingly, intentionally and with deliberate indifference to the serious medical needs of Isaiah.

153.   All Defendants engaged in the conduct described above within the course and scope of their employment.

154.   Defendants' actions and failures to act proximately caused injury to Isaiah, his Estate, and his beneficiaries.

155.   The injuries of Isaiah, his Estate, and his beneficiaries were a foreseeable result of Defendants' conduct.

156.   Defendants' actions were grossly negligent, unreasonable, intentional, reckless, malicious, wanton and willful, and deliberately indifferent. Their actions violated clearly established law.

157. Defendants are jointly and severally liable for their misconduct.

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution
### Deliberate Indifference to a Pretrial Detainee's Serious Medical Needs
### Against Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, Osweiler, Holzfaster, Smith, and Redman

158. All of the foregoing factual allegations are incorporated as if set forth fully herein.

159. Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, Osweiler, Holzfaster, Smith, and Redman acted under color of state law to deprive Isaiah Trammell of his rights, privileges, and immunities secured by the Fourth and Fourteenth Amendment to the U.S. Constitution as a pretrial detainee, including but not limited to the right to objectively reasonable and constitutionally adequate medical care when incarcerated.

160. Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, Osweiler, Holzfaster, Smith, and Redman were deliberately indifferent to Isaiah's serious medical needs, including needs presented by his autism, his acts of self-harm causing head injuries, and his suicidal intent and plan. These Defendants failed to provide Isaiah with objectively reasonable and constitutionally adequate medical care for his serious medical needs, despite Isaiah's clear articulation of each and repeated requests for help.

161. A plaintiff alleging defendants' deliberate indifference to a pretrial detainee's serious medical needs in violation of the Fourteenth Amendment must show (a) that the detainee had a sufficiently serious medical need, and (b) that each defendant "acted deliberately (not accidentally)" and "also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Helphenstine v. Lewis County, Kentucky*, 60 F. 4th 305, 317 (6th Cir. 2023), citing *Brawner v. Scott County*, 14 F. 4th 585, 596 (6th Cir. 2021).

162.    The risk of suicide is an objectively serious medical need that satisfies the first element of deliberate indifference. *Estate of Clark v. Walker*, 865 F.3d 544, 553 (6th Cir. 2017). More generally, psychological needs (like those presented by Isaiah's autism) are serious medical needs, especially when they result in suicidal tendencies. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

163.    The second element of deliberate indifference is met when it was obvious that there was a strong likelihood that an inmate would attempt suicide. *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 601 (6th Cir. 2020).

164.    Correctional officers, like Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler violate an incarcerated person's constitutional rights when they intentionally deny or delay a person's access to medical care for a serious medical need. *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004), citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). 396.

165.    Correctional officials who have "been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock*, 273 F.3d at 702.

166.    When a corrections official actually knew about an inmate's serious risk of suicide but failed to seek appropriate medical or psychiatric care for the inmate, the corrections officer's "particular conduct" violates clearly established law and is deliberately indifferent. *Estate of Clark*, 865 F.3d at 553.

167.    The law does not permit the Defendant officers to avoid liability by claiming reliance upon the mental health professionals who briefly spoke to Isaiah shortly before his death without deescalating his crisis. It is not reasonable for corrections officers to rely upon non-medical

28

mental health staff to provide a medical and psychiatric assessment. *Greene v. Crawford County*, 22 F.4th 593, 615 (6th Cir. 2022).

168.     Providing non-medical care to an inmate with serious medical and psychiatric needs does not pass constitutional muster. As the Sixth Circuit has recognized, "[a]lthough officials can avoid constitutional liability by addressing the inmate's serious need, they cannot escape a deliberate-indifference claim by fetching a band-aid if the inmate is hemorrhaging." *Finley v. Huss*, 723 F. App'x 294, 298 (6th Cir. 2018), citing *Bays v. Montmorency County*, 874 F.3d 264, 269 (6th Cir. 2017) and *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014).

169.     Nor is it per se reasonable for corrections officers to automatically defer to medical staff. This deference is unreasonable when the officer has knowledge of additional information regarding the inmate's condition or if the inmate's condition changes after medical staff's evaluation. *Grote v. Kenton County*, 85 F.4th 397, 412 (6th Cir. 2023). Even if these Defendants had called for a medical assessment (which they did not do), their duty under the law would not be discharged if the medical provider did not provide the necessary care, and they would remain liable for deliberate indifference. *Clark-Murphy v. Foreback*, 439 F.3d 280, 289–90 (6th Cir. 2006).

170.     Here, Isaiah was seen by non-medical, non-psychiatric mental health staff (Defendants Holzfaster and Smith). But even if they had been medical professionals, Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler witnessed Isaiah's continued deterioration after they left and knew that they did not provide the necessary care for Isaiah.

171.    Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler are liable for deliberate indifference based on the facts articulated above, specifically including but not limited to the following:

a.  Defendants Solomon, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler each had actual knowledge that Isaiah's autism had driven him to extreme anxiety and distress in the conditions of incarceration, and that this had caused him to engage in stimming and then intentional self-harm by striking his head against hard surfaces in his cell.

b.  As of 10:04 a.m., Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler each had actual knowledge that Isaiah planned to kill himself by banging his head against his cell door and/or walls. Isaiah's suicidal ideation, intent, and plan presented a serious medical need.

c.  Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler also knew that Defendants Holzfaster and Smith refused to provide Isaiah care to prevent another suicide attempt and failed to refer Isaiah to medical staff. When these officers witnessed Defendants Holzfaster's and Smith's deliberate indifference to Isaiah's psychiatric crisis, this triggered the officers' duty to obtain medical attention to address Isaiah's serious medical needs.

d.  Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler were each present near Isaiah's cell and witnessed his continued psychiatric deterioration for the 13 minutes between when they learned of his suicidal intent and plan and when he caused his own fatal injuries as planned.

e.  Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler each had the ability and duty to seek reasonable and appropriate medical and/or psychiatric care for Isaiah when they observed his serious medical needs.

f.  Despite the availability of such medical care both inside and outside the Jail, none of these Defendants sought medical care for Isaiah. This includes when Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler failed to seek medical care after they learned Isaiah had continued suicidal intent and a suicide plan at 10:04 a.m. This includes when Defendants Solomon and Blum failed to seek medical care after they knew Isaiah had engaged in self-harm and that Isaiah was experiencing extreme anxiety. This also includes prior occasions on which these Defendants and Defendant Godsey observed Isaiah's continued psychiatric escalation but failed to obtain necessary medical care, even when "mental health" services were plainly inadequate to address his needs.

g.  Defendants Solomon, Godsey Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler each made deliberate choices to ignore Isaiah's serious medical needs,

and these choices were, at minimum, reckless actions taken in the face of a known and unjustifiably high risk of (fatal) harm to Isaiah.

172.     A head injury is an objectively serious medical need. *Mercer v. Athens County*, 72 F. 4th 152, 161 (6th Cir. 2023), citing *Howell v. NaphCare, Inc.*, 67 F. 4th 302, 311 (6th Cir. 2023).

173.     Defendant Redman deliberately chose to ignore Isaiah's head injuries on two separate occasions, thus recklessly disregarding the obvious and unjustifiably high risk that Isaiah had sustained, among other injuries, a traumatic brain injury and that he would continue to self-injure.

174.     Defendant Redman is liable for deliberate indifference based on the facts articulated above, specifically including but not limited to the following:

   a.   Despite MHP Fraser's request for him to evaluate Isaiah based on a report of head pain caused by serious trauma, Defendant Redman did not see Isaiah or ask another medical professional to do so. Defendant Redman thus ignored Isaiah's serious medical need of head injury and denied Isaiah necessary medical care

   b.   When Defendant Redman saw Isaiah when Isaiah was placed in the restraint chair for the first time, Isaiah had a visible head injury and was exhibiting obvious psychiatric distress and making continued efforts to self-harm and die by suicide.

   c.   Despite this knowledge, and despite knowing that suicide watch precautions offered no protection to an individual whose lethal means were the cell walls and door, Defendant Redman did not intervene. He should have requested evaluation by a higher level medical professional or taken steps to have Isaiah transferred to a hospital or psychiatric hospital. Instead, he ignored Isaiah's serious medical needs and denied Isaiah necessary medical care.

   d.   Defendant Redman's deliberate choices to ignore Isaiah's serious medical needs were, at minimum, reckless actions taken in the face of a known and unjustifiably high risk of (fatal) harm to Isaiah.

175.     Defendant Holzfaster is liable for deliberate indifference based on the facts articulated above, specifically including but not limited to the following:

   a.   Defendant Holzfaster had actual knowledge that Isaiah's autism had driven him to extreme anxiety and distress in the conditions of incarceration, and that this had

caused him to engage in stimming and then intentional self-harm by striking his head against hard surfaces in his cell.

b. Defendant Holzfaster knew by 10:04 a.m. that Isaiah had already attempted to die by suicide by banging his head into his cell doors and walls.

c. She knew by 10:04 a.m. that Isaiah wanted to and planned to attempt suicide again using the same method of self-injury.

d. Despite this knowledge, Defendant Holzfaster left Isaiah without de-escalating his obvious psychiatric crisis and refused to provide him further care.

e. Despite this knowledge, and despite her recognition that she was not competent to handle Isaiah's serious medical needs (as shown by her departure), Defendant Holzfaster failed to seek medical help for Isaiah.

f. Defendant Holzfaster had the ability and duty to seek reasonable and appropriate medical and/or psychiatric care for Isaiah.

g. Despite the availability of such medical care both inside and outside the Jail, Defendant Holzfaster did not seek medical care for Isaiah.

h. Defendant Holzfaster's failure is particularly egregious because she was NaphCare's Mental Health Director and could have expedited the process of transferring Isaiah to a psychiatric hospital or at least secured the prompt attention of the on-call psychiatrist.

i. Defendant Holzfaster's deliberate choices to ignore Isaiah's serious medical needs were, at minimum, reckless actions taken in the face of a known and unjustifiably high risk of (fatal) harm to Isaiah.

176.    Defendant Smith is liable for deliberate indifference based on the facts articulated above, specifically including but not limited to the following:

a. Defendant Smith had actual knowledge that Isaiah's autism had driven him to extreme anxiety and distress in the conditions of incarceration, and that this had caused him to engage in stimming and then intentional self-harm by striking his head against hard surfaces in his cell.

b. Defendant Smith knew by 10:04 a.m. that Isaiah had already attempted to die by suicide by banging his head into his cell doors and walls. She knew by 10:04 a.m. that Isaiah wanted to and planned to attempt suicide again using the same method of self-injury.

c.   Despite this knowledge, Defendant Smith left Isaiah without de-escalating his obvious psychiatric crisis and refused to provide him further care.

d.   Despite this knowledge, and despite her recognition that she was not competent to handle Isaiah's serious medical needs (as shown by her departure), Defendant Smith failed to seek medical help for Isaiah. Defendant Smith had the ability and duty to seek reasonable and appropriate medical and/or psychiatric care for Isaiah.

e.   Despite the availability of such medical care both inside and outside the Jail, Defendant Smith did not seek medical care for Isaiah.

f.   Defendant Smith's deliberate choices to ignore Isaiah's serious medical needs were, at minimum, reckless actions taken in the face of a known and unjustifiably high risk of (fatal) harm to Isaiah.

177.   The conduct of Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, Osweiler, Holzfaster, Smith, and Redman was a direct and proximate cause of Isaiah's injuries, including pain and suffering, emotional trauma, pre-death agony, death, and lost chance for treatment and survival.

178.   Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, Osweiler, Holzfaster, Smith, and Redman directly and proximately caused injuries and damages to Isaiah, his family, and his Estate.

179.   Defendants are jointly and severally liable for this conduct.

## SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution
### Failure to Protect

### Against Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler

180.   All of the foregoing factual allegations are incorporated as though fully set forth here.

181.    A correctional officer is liable for failure to protect when a pretrial detainee faced a "substantial risk of serious harm" before suffering an injury (including a risk that arises from a physical or mental impairment), and the officer knew the facts of this risk but responded to the risk in an unreasonable way. *Lawler as Next Friend of Lawler v. Hardeman County*, 93 F. 4th 919, 928–29 (6th Cir. 2024), citing *Farmer v. Brennan*, 511 U.S. 825, 834, 837, 844 (1994).

182.    The risk of death by suicide presents a substantial risk of serious harm. *Lawler*, 93 F. 4th at 928–29 (collecting cases).

183.    By 4:20 a.m. when they placed Isaiah in an emergency restraint chair, Defendants Solomon and Blum had actual knowledge of facts demonstrating Isaiah's psychiatric deterioration and substantial risk of serious harm from acts of self-harm and suicide, including but not limited to the following:

     a.    Isaiah was on suicide watch;

     b.    Isaiah's behavior in his cell indicated extreme anxiety and distress;

     c.    Isaiah had been seen by Mental Health Professional Fraser multiple times;

     d.    Isaiah engaged in self-harm by striking his head against his cell door and walls;

     e.    Isaiah's distress escalated upon Defendant Solomon's order to put Isaiah in the restraint chair;

     f.    Isaiah was exhausted and suffering severe sleep deprivation.

184.    Beginning when Defendant Godsey recognized Isaiah's psychiatric deterioration after Isaiah was released from the restraint chair at 6:15 a.m., and continuing when Defendant Godsey called the mental health department between 9:00 and 9:30 a.m. and again when he observed Isaiah's behaviors escalate after 9:30 a.m. video court, Defendant Godsey had actual

knowledge of facts demonstrating a "substantial risk of harm" to Isaiah, including but not limited to the following:

a. Isaiah was on suicide watch;

b. Isaiah previously engaged in self-harm by striking his head against his cell door and walls;

c. Isaiah previously attempted suicide by striking his head against his cell door and walls;

d. Isaiah was pacing and hitting his cell door with his fist after being released from the restraint chair at 6:15 a.m.;

e. Defendant Smith refused to see Isaiah when Defendant Godsey requested that she help Isaiah between 9:00 and 9:30 a.m.;

f. Isaiah became even more upset after attending video court at 9:30 a.m. and was jumping around and screaming in his cell, showing obvious psychiatric distress;

g. Defendant Godsey called the mental health department again based on his observations of Isaiah's distress after video court, thus recognizing the severity of Isaiah's psychiatric needs;

h. Isaiah retained access to lethal means within his suicide watch cell: the cell door and walls.


185.    By 10:04 a.m. at the latest, Defendants Bittinger, Choi, Jones, Littlejohn, and Osweiler each had actual knowledge of facts demonstrating a "substantial risk of harm" to Isaiah, including but not limited to the following:

a. Isaiah was on suicide watch;

b. Isaiah previously engaged in self-harm by striking his head against his cell door and walls;

    c.   Isaiah previously attempted suicide by striking his head against his cell door and walls;

    d.   Isaiah was screaming and crying out, showing obvious psychiatric distress;

    e.   Isaiah had just expressed continued suicidal ideation;

    f.   Isaiah had just expressed suicidal intent and plan, i.e., that he wanted and planned to kill himself by striking his head against his cell doors and walls;

    g.   The mental health professionals, Defendants Holzfaster and Smith, refused to provide assistance to Isaiah to de-escalate his psychiatric crisis and reduce his risk;

    h.   Isaiah retained access to lethal means within his suicide watch cell: the cell door and walls.

186.    It was obvious that Isaiah had a strong likelihood of attempting suicide again, which posed a substantial risk of harm.

187.    The primary purpose of suicide watch is to remove lethal means from a suicidal inmate. Here, it was obvious that the "suicide watch" cell and restraint chair offered no protection to an inmate intent on striking his head against hard surfaces. Instead, the cell itself presented the lethal means.

188.    It was obvious that Isaiah needed urgent medical and psychiatric intervention as well as a safe environment.

189.    Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler reacted unreasonably when confronted with the facts of Isaiah's obvious and imminent suicide risk because they failed to seek medical and/or psychiatric assistance, despite the availability of such professionals in the Montgomery County Jail and despite access to procedures to transfer Isaiah to a hospital.

190. Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler further reacted unreasonably by failing to take actions to mitigate the risk posed by Isaiah's continued access to lethal means in his cell.

191. The conduct of Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler was a direct and proximate cause of Isaiah's injuries, including pain and suffering, emotional trauma, pre-death agony, death, and lost chance for treatment and survival.

192. Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler directly and proximately caused injuries and damages to Isaiah, his family, and his Estate.

193. Defendants are jointly and severally liable for this conduct.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution
### Supervisory Liability
### Against Defendants Solomon, Godsey, and Holzfaster

194. All of the foregoing factual allegations are incorporated as though fully set forth here.

195. The constitutional injuries complained of here were proximately caused by (i) the intentional misconduct of the supervisory defendants, or (ii) by these supervisory defendants being deliberately and recklessly indifferent to their subordinates' misconduct, knowing that ignoring that misconduct would necessarily violate Isaiah's constitutional rights.

196. Specifically, Defendants Solomon, Godsey, and Holzfaster had actual and/or constructive knowledge of their subordinates' unconstitutional misconduct and facilitated, condoned, and oversaw their deliberately indifferent actions directed at Isaiah.

197. Defendants Solomon, Godsey, and Holzfaster acted under color of law and within the scope of their respective employment when they took these supervisory actions.

198.    The failure of Defendants Solomon, Godsey, and Holzfaster to provide the constitutionally necessary level of supervision to the Jail corrections and mental health staff was a direct and proximate cause of Isaiah's injuries, including pain and suffering, emotional trauma, pre-death agony, death, and lost chance for treatment and survival.

199.    Defendants Solomon, Godsey, and Holzfaster directly and proximately caused injuries and damages to Isaiah, his family, and his Estate.

200.    Defendants are jointly and severally liable for this conduct.

### FOURTH CLAIM FOR RELIEF

### Ohio R.C. § 2125.01 – Survivorship Claim for the Willful, Wanton, or Reckless Breach of Duty Against Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler

201.    All of the foregoing factual allegations are incorporated as though fully set forth here.

202.    Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler as correctional officers in the Montgomery County Jail, each breached their duties to provide access to medical care and to protect Isaiah from injury, all in violation of Ohio law.

203.    Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler each violated their duty to exercise due care for Isaiah, and they committed the acts alleged in this Complaint in a reckless, willful and/or wanton manner while working as a correctional officer for Montgomery County.

204.    Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler each recklessly breached their duty of care to Isaiah and proximately caused injuries and damages to Isaiah, his family, and his Estate.

205. The conduct of Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, and Osweiler was a direct and proximate cause of Isaiah's injuries, including pain and suffering, emotional trauma, pre-death agony, death, and lost chance for treatment and survival.

206. Defendants are jointly and severally liable for this conduct.

**FIFTH CLAIM FOR RELIEF**
**Ohio R.C. § 2125.01, *et seq*: Wrongful Death**
**Against All Defendants**

207. All of the foregoing factual allegations are incorporated as though fully set forth here.

208. Defendants' actions caused the wrongful death of Isaiah Trammell, resulting in damages recoverable under Ohio Rev. Code § 2125.02

209. Decedent Isaiah Trammell is survived by his beneficiaries, who are represented by Plaintiff in this action.

210. Defendants directly and proximately caused Isaiah's wrongful death and directly and proximately caused his Estate and beneficiaries to suffer, and they will continue to suffer, *inter alia*, pecuniary loss, loss of his aide, comfort, consortium, society, companionship, guidance, protection, financial and other support, as well as the grief and sorrow from the loss of the love and affection of and for their loved one, and they have otherwise suffered damages all to their detriment.

211. Defendants are jointly and severally liable for this conduct.

**SIXTH CLAIM FOR RELIEF**
**Ohio R.C. §§ 2125.01, 2305.21 – Survivorship Claim**
**Against All Defendants**

212.    All of the foregoing factual allegations are incorporated as though fully set forth here.

213.    As a direct and proximate result of the negligent, willful, wanton, reckless, and/or outrageous conduct of Defendants, Isaiah Trammell was caused to suffer severe and serious mental anguish and severe conscious physical pain and suffering prior to his death, for which compensation is sought.

214.    Defendants are jointly and severally liable for this conduct.

### SEVENTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 Fourteenth Amendment – *Monell* claim for Deliberate Indifference to Serious Medical Needs of Pretrial Detainees

### Against Defendants Montgomery County and NaphCare, Inc.

215.    All of the foregoing factual allegations are incorporated as though fully set forth here.

216.    The actions of Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, Osweiler, Holzfaster, Smith, and Redman as alleged above, were taken pursuant to one or more interrelated *de facto* policies, practices and/or customs of civil rights violations and unconstitutional practices of Defendants Montgomery County and NaphCare, Inc.

217.    Defendants Montgomery County and NaphCare, Inc. at all times relevant herein, approved, authorized, and acquiesced in the unlawful and unconstitutional conduct of its respective employees and/or agents and consequently is liable for the acts of those agents, pursuant to 42 U.S.C. § 1983.

218.    Defendant Montgomery County is responsible for the care and treatment of people incarcerated in the Montgomery County Jail. Montgomery County is required to ensure that the

policies, practices, and customs of the Jail comply with federal and Ohio law concerning the treatment of persons in custody.

219.    Pursuant to its contract with Montgomery County, Defendant NaphCare, Inc. is responsible for the mental health care and medical care for people incarcerated in the Montgomery County Jail. Montgomery County is required to ensure that the policies, practices, and customs of NaphCare within the Jail comply with federal and Ohio law.

220.    At all times relevant, Defendant Montgomery County had interrelated *de facto* policies, practices, and customs which included, *inter alia:*

   a.  the implementation of unconstitutional policies—whether written or unwritten, practices, and customs for the denial of medical care;

   b.  a custom of tolerance of the unconstitutional denial of medical care;

   c.  the failure to properly hire, train, supervise, discipline, transfer, monitor, investigate, counsel and/or otherwise control their correctional officers who deny medical care to detainees;

   d.  a custom of failing to monitor people with serious medical needs, including people at risk of death, as shown by prior incidents of individuals with serious medical needs dying in the Jail.

221.    The unconstitutional actions of the Defendants as alleged in this complaint were part and parcel of a widespread jail policy, practice and custom is further established by the involvement in, and ratification of, these acts by municipal supervisors and policymakers, as well as by a wide range of other officials, officers, and divisions of Montgomery County and its Sheriff's Office.

222.    This widespread policy resulted in a pattern of unconstitutional denials of medical care by NaphCare employees and correctional officers, of which Defendants Montgomery County and NaphCare were aware.

223.    The policies, practices and/or customs alleged in this complaint, separately and together, are the proximate cause of the injuries to and death of Isaiah Trammell.

224.    These policies, practices, and/or customs, along with the ratification of prior denials of medical care by Defendants Montgomery County and NaphCare, made medical staff and officers like Defendants Solomon, Godsey, Bittinger, Blum, Choi, Jones, Littlejohn, Osweiler, Holzfaster, Smith, and Redman believe they would not face discipline or other consequences for their unconstitutional actions.

225.    The interrelated policies, practices and customs, as alleged in this complaint, individually and together, were maintained and implemented with deliberate indifference, and encouraged the Defendants to commit the acts against Isaiah Trammell alleged in this complaint.

226.    Defendants Montgomery County and NaphCare, Inc. therefore acted as the moving force behind and the direct and proximate causes of the violations of Isaiah Trammell's constitutional rights and all injuries and damages suffered by him, his Estate, and his beneficiaries.

227.    Defendants are jointly and severally liable for this conduct.

## JURY DEMAND

228.    Plaintiff demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.  Award Plaintiff compensatory damages in an amount to be shown at trial;

B.  Award punitive damages against all Defendants in an amount to be shown at trial;

C.  Award Plaintiff reasonable attorney's fees, costs, and disbursements;

D.  Award Plaintiff pre and post judgment interest;

E.  Grant Plaintiff such additional relief as the Court deems just and proper.

Respectfully submitted,

*/s/* Sarah Gelsomino
Sarah Gelsomino (0084340)
Elizabeth Bonham (0093733)
FG+G
50 Public Square, Suite 1900
Cleveland, OH 44113-2205
T: 216-241-1430
F: 216-621-0427
sarah@FGGfirm.com
elizabeth@FGGfirm.com

Jacqueline Greene (0092733)
FG+G
35 East 7th Street, Suite 201
Cincinnati, OH 45202
T: 513-572-4200
F: 216-621-0427
jacqueline@FGGfirm.com

*Counsel for Plaintiff*